MARION F. EDWARDS, Judge.
 

 12Defendant/appellant, Jermaine Loeb (“Loeb”), appeals his conviction and sentence on a charge of possession with intent to distribute heroin in violation of La. R.S. 40:966(A). For reasons that follow, we affirm both the conviction and the enhanced sentence.
 

 The Jefferson Parish District Attorney’s Office filed a bill of information on February 7, 2008 charging Loeb with the drug charge at issue herein. He pled not guilty and filed several pre-trial motions, including motions to suppress the evidence and his statement, which were denied after a hearing. After a two-day trial, a unanimous twelve-person jury found Loeb guilty as charged. He was sentenced to thirty
 
 *920
 
 years at hard labor with the first five years being served without the benefit of parole, probation, or suspension of sentence.
 

 Subsequently, the State filed a multiple offender bill of information alleging that Loeb was a fourth felony offender based on a 1994 conviction for ^manslaughter and two convictions for possession of cocaine in 1998 and 2001. Loeb denied the allegations contained in the multiple bill. The State amended the multiple bill to allege that Loeb was a third felony offender. At the hearing on the multiple bill of information, Loeb stipulated to his status as a third felony offender. The trial court vacated Loeb’s original sentence and imposed an enhanced sentence of thirty-five years at hard labor without the benefit of probation or suspension of sentence.
 

 This timely appeal followed.
 

 FACTS
 

 At approximately 12:45 p.m. on December 11, 2007, several officers of the Jefferson Parish Sheriffs Office were patrolling the Alex Korman area of the Woodmere Subdivision as part of Project Safe Neighborhood (“PSN”). Detective Kenneth Lat-our (“Detective Latour”) and Sergeant Curtis Matthews (“Sergeant Matthews”), who were wearing black raid vests with “Sheriff’ indicated in yellow, parked their unit and proceeded on foot patrol into a courtyard in the middle of an apartment complex that was known for drug trafficking. The officers’ purpose of walking through the courtyard was to see if there was any activity.
 

 Upon the officers’ entry into the courtyard, they observed five male subjects talking in a group. Two of the subjects looked at the officers and immediately fled in opposite directions. The three other subjects remained at the scene. Detective Latour and Sergeant Matthews pursued the fleeing subjects, one of whom was Loeb. Sergeant Matthews was unable to catch up with Loeb and radioed for help. Detective Latour, who had lost the subject he was pursuing, along with Detective Alvin Módica (“Detective Módica”), and Sergeant Todd Vignes (“Sergeant Vignes”), who were in the area and part of the team working PSN, responded to Sergeant Matthews’ request for assistance. Detective Módica, who was between |4two buildings in the area where Loeb was fleeing, heard Sergeant Matthews’ radio call for help and then saw Loeb run past. Detective Módi-ca chased Loeb, who was running in a full sprint, for a half block during which time Loeb looked back at Detective Módica several times. Detective Módica observed that Loeb had a red bandanna in one hand and some sort of plastic bag protruding from the other hand. When Detective Mó-dica caught up with Loeb, Loeb dropped the bandanna and discarded the plastic bag. A fight ensued, and Detective Módi-ca was forced to pepper spray Loeb in order to subdue and handcuff him.
 

 Sergeant Vignes, who was behind Detective Módica during the chase, observed Loeb throw down a bandanna and a small object when Detective Módica caught up to him. Sergeant Vignes retrieved the discarded bandanna and object, which turned out to be a clear plastic bag that had twenty-seven individual packets of tin foil. He conducted a field test of the contents, which was positive for heroin. Loeb was then placed under arrest. A search of his person incident to arrest yielded $2,510 cash from Loeb’s back pocket.
 

 Loeb underwent a decontamination process for the pepper spray which involved facing him into the wind, rinsing his eyes with water, and being attended to by Emergency Medical Services. After the decontamination process, Sergeant Matthews advised Loeb of his rights, and he was transported to the detective bureau to
 
 *921
 
 be interviewed. Loeb participated in a pre-interview but refused to give a taped statement. According to Sergeant Matthews and Detective Módica, Loeb admitted during the pre-interview that he sold heroin in the location where he was apprehended on a daily basis to make money. He also admitted that the police had caught him and he would “take his charge.”
 

 Loeb did not testify at trial but presented the testimony of a close Mend, Iona Wallace, who testified she gave Loeb $2,500 in cash the morning he was | r,arrested. She explained the money was to purchase a car for herself and she gave Loeb the money to hold while she ran errands. She denied giving Loeb any drugs.
 

 LAW AND ANALYSIS
 

 On appeal, Loeb assigns five errors for our review. Two of those errors relate to the original sentence, which was vacated by the trial court after Loeb’s admission to the multiple offender charge. Therefore, those issues are moot and will not be considered by this Court in this opinion.
 

 The remaining three assignments of error concern the denial of the motion to suppress the evidence, the denial of the motion to suppress the statement, and the sufficiency of evidence used to support the conviction.
 

 SUPPRESSION OF EVIDENCE
 

 Loeb’s argument that the trial court erred in denying his motion to suppress is based on the contention that officers had no reasonable suspicion to conduct an investigatory stop because they did not observe Loeb engage in suspicious activity or a crime. Loeb asserts that flight alone is insufficient to provide reasonable suspicion for an investigatory stop. Thus, Loeb reasons the discarded heroin should be suppressed as the fruit of an illegal stop.
 

 The State responds that Loeb’s unprovoked flight in a high-crime area upon the approach of the police provides reasonable suspicion for an investigatory stop. The State maintains Loeb abandoned the evidence upon the legal stop and, therefore, the evidence was legally seized.
 

 The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures. If | ^evidence is derived from an unreasonable search or seizure, the proper remedy is exclusion of the evidence from trial.
 
 [1]
 

 In a hearing on a motion to suppress, the State bears the burden of proof in establishing the admissibility of evidence seized without a warrant.
 
 [2]
 
 The trial court’s decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression.
 
 [3]
 

 It is well-established that a police officer may conduct a brief investigatory stop when the officer has a reasonable articulable suspicion of criminal activity.
 
 [4]
 
 
 *922
 
 The
 
 Terry
 
 standard, as codified in La. C'.Cr.P. art. 215.1, authorizes police officers to stop a person in a public place whom they reasonably suspect is committing, has committed, or is about to commit an offense and demand that the person identify himself and explain his actions.
 
 [5]
 

 In determining whether the police possessed the requisite minimal level of objective justification for an investigatory stop based on reasonable suspicion of criminal activity, reviewing courts must look at the totality of the circumstances of each case, a process which allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.
 
 [6]
 
 Police do not have to observe what they know to be criminal behavior before ^investigating; the requirement is that the officers have a reasonable suspicion of criminal activity.
 
 [7]
 

 An officer’s mere unparticular-ized suspicion or “hunch” of criminal activity is insufficient to establish reasonable grounds to stop a person.
 
 [8]
 
 Factors that may support reasonable suspicion for an investigatory stop include an officer’s experience, his knowledge of recent criminal patterns, and his knowledge of an area’s frequent incidents of crime.
 
 [9]
 
 Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.
 
 [10]
 
 While an individual’s mere presence in a high-crime area, standing alone, is insufficient to justify an investigatory stop, his presence in a high-crime area, coupled with nervousness, startled behavior, flight or suspicious actions upon the approach of the officers, gives rise to reasonable suspicion for an investigatory stop.
 
 [11]
 

 In
 
 Illinois v. Wardlow,
 

 [12]
 

 the United States Supreme Court held that an individual’s unprovoked flight through a high-crime area in response to the approach of the police provides reasonable suspicion to justify an investigatory stop. In
 
 Wardlow,
 
 police officers were in a four-car caravan converging on an area known for heavy narcotics trafficking- in order to investigate drug transactions. The two officers in the last car observed the defendant standing next to a building holding an opaque bag. The defendant looked in the direction of the officers and then fled. The officers pursued the defendant and eventually stopped him. A protective pat down search revealed the defendant was carrying a gun.
 
 [13]
 

 The United States Supreme Court found that it was the defendant’s unprovoked flight upon noticing the police that aroused the officers’ suspicion and [snot the defendant’s mere presence in a high-crime area.
 
 [14]
 
 The Supreme Court stated, “[h]eadlong flight — wherever it occurs — is the consummate act of evasion; It is not necessarily indicative of wrongdoing, but it
 
 *923
 
 is certainly suggestive of such.”
 
 [15]
 
 Noting that an individual has a right to ignore the police and go about his business, the United States Supreme Court stated that unprovoked flight is not a mere refusal to cooperate. It further stated that “[f]light, by its very nature, is not ‘going about one’s business’; in fact, it is just the opposite.”
 
 [16]
 

 In
 
 State v.
 
 Johnson,
 
 [17]
 
 the Louisiana Supreme Court found that police officers had reasonable suspicion to conduct an investigatory stop when the defendant and his companion “significantly picked up their pace” and headed in a direction away from the officers. In
 
 Johnson,
 
 the police officers were patrolling an area known for high narcotics activity. The officers approached the defendant and his companion in a marked unit. The two men picked up their pace and headed toward a crossover that led to another courtyard. The men were “nearly running” and repeatedly looked over their shoulders at the officers.
 
 [18]
 
 The officers stopped the men before they reached the crossover and ordered them to place their hands on the hood of the patrol car. Prior to the pat down search, the defendant removed his hand from the hood of the patrol car and dropped a glass crack cocaine pipe to the ground.
 
 [19]
 

 In upholding the validity of the investigatory stop, the
 
 Johnson
 
 Court concluded that, in the context of the circumstances known to the officer, such as “the lateness of the hour, the high-crime character of the area, and the nervous demeanor of the two men reflected in their repeated glances over their shoulders, 19[the defendant’s] evasive conduct provided the minimal objective justification for an investigatory stop.”
 
 [20]
 

 Additionally, in
 
 State v. Burns, supra,
 
 this Court determined that the defendant’s unprovoked flight from the officers in a high-crime area provided the requisite reasonable suspicion to justify the investigatory stop. In
 
 Bums,
 
 the police officer was patrolling a high-crime area at night when he observed the defendant standing in the middle of the street. When the defendant noticed the unmarked unit as “police presence,” he started to walk away toward a nearby residence.
 
 [21]
 
 The defendant kept looking back toward the officer as he was walking away. When the officer exited his vehicle, the defendant began to run.
 
 [22]
 

 In support of his assertion that the stop was unreasonable, Loeb cites
 
 State v. Alvarez.
 

 [23]
 

 Using
 
 Alvarez,
 
 Loeb argues that his presence in a high-crime area and subsequent flight from the police did not provide the police with reasonable suspicion to conduct an investigatory stop.
 

 In
 
 Alvarez,
 
 police officers were on patrol in a high-crime area when they conducted a traffic stop. The officers noticed the defendant standing between two apartment complexes watching the officers conduct the traffic stop. One officer explained that, every time he made eye contact with the defendant, the defendant would “back off.”
 
 [24]
 
 The officer also noted
 
 *924
 
 the defendant was fidgety. The officer decided to interview the defendant to find out what the defendant was doing and why he was walking around in a nervous manner. The officer asked the defendant to come over to talk to him and the defendant responded, “[M]e.” When the officer repeated the request, the defendant replied, “[H]uh.” Thereafter, three officers 17 (¡approached the defendant from different directions at which time the defendant turned and fled.
 
 [25]
 

 The officers pursued the defendant during which time the defendant discarded a gun from his waistband. He ran into an apartment and slammed the door. The officers kicked down the door, entered the apartment, handcuffed the defendant, and informed him he was under arrest. The officers searched the defendant and discovered a small bag of cocaine.
 
 [26]
 
 The
 
 Alvarez
 
 court concluded the police did not have reasonable suspicion to stop the defendant.
 

 We find
 
 Alvarez
 
 clearly distinguishable from the facts of the matter before us in this appeal. Unlike
 
 Alvarez,
 
 the police officers in the present case did not approach the defendant from different directions so that an actual stop was imminent prior to defendant’s flight. Rather, the officers simply walked into the courtyard at which time defendant immediately fled. Additionally, unlike
 
 Alvarez,
 
 there was no interaction between the police officers and defendant before defendant fled.
 

 Based on the jurisprudence, Loeb’s unprovoked flight at the sight of two police officers in a high-crime area gave the police officers reasonable suspicion to conduct an investigatory stop. As such, the discarded bag containing the packets of heroin was properly seized as abandoned property. When property is abandoned prior to any unlawful intrusion into a citizen’s right to be free from governmental interference, the property may be lawfully seized.
 
 [27]
 
 It is only when a defendant is stopped without reasonable cause that the “right to be left alone” is violated, |nthereby rendering the seizure of any abandoned property unlawful.
 
 [28]
 
 Therefore, the trial court properly denied defendant’s motion to suppress the evidence.
 

 SUPPRESSION OF STATEMENT
 

 Loeb asserts the trial court erred in denying his motion to suppress the statement because it was the fruit of an illegal arrest and it was coerced. He maintains that, for reasons asserted in assignment of error number one, his arrest was illegal and, therefore, the pre-interview statement given after his arrest was inadmissible as the fruit of a poisonous tree. Loeb further asserts that his statement was not knowing and voluntary. He contends it was coerced because the police had just pepper sprayed him. He maintains he was still suffering from the effects of the pepper spray when he waived his rights without fully understanding his rights.
 

 As discussed above, the investigatory stop of Loeb was justified; therefore, Loeb’s statement is not the fruit of a poisonous tree. The next issue for our consideration is whether Loeb’s statement was voluntary.
 

 Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove, beyond a reasonable doubt, that the defendant was first advised
 
 *925
 
 of his
 
 Miranda
 

 [29]
 

 rights, that he voluntarily and intelligently waived his
 
 Miranda
 
 rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducements, or promises.
 
 [30]
 
 Whether a defendant’s purported waiver of
 
 Miranda
 
 rights was voluntary is determined by the totality of the circumstances.
 
 [31]
 
 The | ^critical factor in a knowing and intelligent waiver is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement.
 
 [32]
 

 A trial court’s determination on the admissibility and its conclusion on the credibility and weight of the testimony relating to the voluntariness of the statement are entitled to great weight and will not be overturned unless unsupported by the evidence.
 
 [33]
 
 An appellate court is not limited to the evidence adduced at the hearing on the motion in determining whether the trial court’s ruling on a motion to suppress is correct but may also consider pertinent evidence presented at the trial.
 
 [34]
 

 The statement at issue is one that was made by Loeb during the pre-interview, after he was arrested and transported to the detective bureau. According to Sergeant Matthews and Detective Módica, Loeb stated he sold heroin in the area where he was arrested to make money. Loeb subsequently declined to give a formal taped statement.
 

 The thrust of Loeb’s argument is that he was in need of emergency medical care due to the effects of the pepper spray and was given his
 
 Miranda
 
 rights during that procedure rather than at the detective bureau. Loeb contends that, under these circumstances, he was not properly advised of his
 
 Miranda
 
 rights. Accordingly, Loeb asserts that the statement should have been suppressed.
 

 The testimony contradicts Loeb’s argument. The testimony of officers is that Loeb was informed of his
 
 Miranda
 
 rights after he had sufficiently recovered from the effects of the pepper spray. It was estimated that Loeb was advised of these rights about fifteen or twenty minutes after he was pepper sprayed.
 

 | |SAccor ding to testimony, Loeb appeared to be in his right mind and seemed capable of understanding his rights. At the time
 
 Miranda
 
 rights were explained to Loeb, only a drizzle of mucous was coming from his nose and his eyes were wide open and he was not breathing heavily. Loeb answered affirmatively when asked if he understood his rights. The officers’ testimony shows that, after Loeb was pepper sprayed, he went through the decontamination process, which consisted of facing the wind and having water applied.
 

 Nothing in the record indicates the effects of the pepper spray affected Loeb’s ability to understand and voluntarily waive his rights. Further, no evidence was presented at the suppression hearing or at trial that suggested Loeb’s statement was involuntary. He was advised of his rights after going through the decontamination process for pepper spray and after the
 
 *926
 
 effects of the pepper spray had dissipated. Loeb affirmatively acknowledged that he understood his rights and was transported to the detective bureau where he participated in a pre-interview and was cordial.
 

 Based on the foregoing, we find that Loeb’s statement was voluntarily given and, therefore, the trial court did not err in denying the motion to suppress the statement.
 

 SUFFICIENCY OF EVIDENCE
 

 In his final assignment of error, Loeb argues that, should this Court find the motion to suppress the evidence and statement should have been granted, as asserted in assignments of error numbers one and two, then the evidence, without the heroin and statement, is insufficient to support a conviction.
 

 Loeb does not make any argument that any of the elements of the crime charged were not proven. Further, as the State points out to this Court, Loeb does 114not suggest that the requirements of
 
 Jackson v. Virginia,
 

 [35]
 

 which provides that evidence is sufficient when a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt after viewing the evidence in the light most favorable to the State, were not met.
 

 Because we have found that the statement and the evidence were admissible, we find no merit in this argument.
 

 ERROR PATENT DISCUSSION
 

 This Court has reviewed for errors patent and found the following:
 
 [36]
 
 Although the commitment indicates defendant was advised of the two-year prescriptive period for filing an application for post-conviction relief in accordance with La.C.Cr.P. art. 930.8, the sentencing transcript does not so reflect. When there is an inconsistency between the minute entry and the transcript, the transcript prevails.
 
 [37]
 
 Accordingly, by way of the opinion, this Court advises Loeb that he has two years from the date his conviction and sentence become final to seek post-conviction relief.
 
 [38]
 

 We hereby affirm the conviction and enhanced sentence of Loeb and inform him that he has two years from the date his conviction and sentence become final to seek post-conviction relief.
 

 AFFIRMED.
 

 [1]
 

 .
 
 State v. Duckett,
 
 99-314 (La.App. 5 Cir. 7/27/99), 740 So.2d 227, 230.
 

 [2]
 

 . La.C.Cr.P. art. 703(D).
 

 [3]
 

 .
 
 State v. Ayche,
 
 07-753 (La.App. 5 Cir. 3/11/08), 978 So.2d 1143, 1148,
 
 writ denied,
 
 08-2291 (La.1/30/09), 999 So.2d 752, and
 
 writ denied,
 
 08-1115 (La.2/13/09), 999 So.2d 1140. There are two writ denials related to this case, 08-2291 (La.1/30/99), 999 So.2d 752, and 08-1115 (La.2/13/09), 999 So.2d 1140. However, they both relate to applications for post-conviction relief.
 

 [4]
 

 . La.C.Cr.P. art. 215.1;
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968);
 
 State v. Belton,
 
 441 So.2d 1195 (La.1983), ce
 
 rt. denied,
 
 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984).
 

 [5]
 

 .
 
 State v. Ayche,
 
 978 So.2d at 1148.
 

 [6]
 

 .
 
 State v. Boyer,
 
 07-476 (La.10/16/07), 967 So.2d 458, 469 (quotations omitted; citations to quoted material omitted).
 

 [7]
 

 .
 
 State v. Benjamin,
 
 97-3065 (La.12/1/98), 722 So.2d 988, 989.
 

 [8]
 

 .
 
 State v. Burns,
 
 04-175 (La.App. 5 Cir. 6/29/04), 877 So.2d 1073, 1076.
 

 [9]
 

 .
 
 State v. Ayche,
 
 978 So.2d at 1149.
 

 [10]
 

 .
 
 Id.
 

 [11]
 

 .
 
 State v. Burns,
 
 877 So.2d at 1076.
 

 [12]
 

 . 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).
 

 [13]
 

 . 528 U.S. at 121-22, 120 S.Ct. at 674-75.
 

 [14]
 

 .
 
 Illinois v. Wardlow,
 
 528 U.S. at 124, 120 S.Ct. at 676.
 

 [15]
 

 .
 
 Id.
 

 [16]
 

 .
 
 Id.
 
 at 528 U.S. at 127, 120 S.Ct. at 676.
 

 [17]
 

 . 01-2081 (La.4/26/02), 815 So.2d 809, 810 (per curiam).
 

 [18]
 

 .
 
 Id.
 

 [19]
 

 .
 
 Id.
 
 at 810-11.
 

 [20]
 

 .
 
 State v. Johnson,
 
 815 So.2d at 811.
 

 [21]
 

 .
 
 State v. Burns,
 
 877 So.2d at 1077.
 

 [22]
 

 .
 
 Id.
 

 [23]
 

 . 08-558 (La.App. 5 Cir. 1/13/09), 8 So.3d 50.
 

 [24]
 

 .
 
 Id.
 
 at 52.
 

 [25]
 

 .
 
 State v. Alvarez,
 
 8 So.3d at 52.
 

 [26]
 

 .
 
 Id.
 
 at 53.
 

 [27]
 

 .
 
 State v. Ayche,
 
 978 So.2d at 1149.
 

 [28]
 

 .
 
 State v. Ayche,
 
 978 So.2d at 1149.
 

 [29]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [30]
 

 . La. R.S. 15:451;
 
 State v. Franklin,
 
 03-287 (La.App. 5 Cir. 9/16/03), 858 So.2d 68, 70,
 
 writ denied,
 
 03-3062 (La.3/12/04), 869 So.2d 817.
 

 [31]
 

 .
 
 State v. Batiste,
 
 06-824 (La.App. 5 Cir. 3/13/07), 956 So.2d 626, 633,
 
 writ denied,
 
 07-892 (La.1/25/08), 973 So.2d 751.
 

 [32]
 

 .
 
 State v. Batiste,
 
 956 So.2d at 634.
 

 [33]
 

 .
 
 Id.
 

 [34]
 

 .Id.
 

 [35]
 

 . 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 [36]
 

 .
 
 See,
 
 La.C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Wetland,
 
 556 So.2d 175 (La.App. 5 Cir.1990).
 

 [37]
 

 .
 
 State v. Lynch,
 
 441 So.2d 732, 734 (La.1983).
 

 [38]
 

 . La.C.Cr.P. art. 930.8.